## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, 59 Route 10, East Hanover, New Jersey 07936; | ) ) ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) |
| XAVIER BECERRA, in his official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue, S.W., Washington, D.C. 20201; | ) ) ) ) ) ) ) |
| and | ) ) |
| ROBERT M. CALIFF, M.D., in his official capacity as COMMISSIONER OF FOOD AND DRUGS, FOOD AND DRUG ADMINISTRATION, 10903 New Hampshire Avenue, Silver Spring, MD 20993, | ) ) ) ) ) ) ) ) |
| *Defendants*. | ) ) ) |

Civil Action No. 25-90

## VERIFIED COMPLAINT

Plaintiff Novartis Pharmaceuticals Corporation (Novartis) brings this Complaint against Defendants Xavier Becerra, in his official capacity as Secretary of Health and Human Services of the Department of Health and Human Services (HHS), and Robert M. Califf, M.D., in his official capacity as Commissioner of Food and Drugs, head of the Food and Drug Administration (FDA, or the agency), and alleges as follows:

1

## PRELIMINARY STATEMENT

1.      To encourage drug sponsors to develop important information about the safety and effectiveness of drugs in children, Congress requires the Food and Drug Administration (FDA) to grant six months of exclusivity to drug sponsors who conduct pediatric studies in response to the agency's written request.  21 U.S.C. §§ 355a(b)(1), (c)(1).  Once a manufacturer comes forward with studies that fairly respond to FDA's request and are conducted in accordance with commonly accepted scientific principles, the agency *must* grant pediatric exclusivity.  *Id.* § 355a(d)(3).

2.      The six-month pediatric-exclusivity period begins to run when a product's applicable patent protection expires.  When the statutory preconditions are satisfied, FDA must fulfill its role to extend pediatric exclusivity as the statute mandates.  Were FDA to refuse, it would arrogate to itself the power to deny manufacturers the benefit of the statutory bargain struck by Congress as reward for the difficulties that attend the delicate and vital pediatric-testing enterprise.

3.      FDA has failed to hold up its end of the bargain here.  The agency does not dispute that Novartis earned pediatric exclusivity for its leading heart-failure medicine ENTRESTO®.  That exclusivity period extends ENTRESTO's market exclusivity following the expiration of a key patent covering ENTRESTO on January 15, 2025, for six months until July 15, 2025.  Although FDA had previously approved an Abbreviated New Drug Application (ANDA) submitted by generic player MSN, the U.S. Court of Appeals for the Federal Circuit recently ruled in favor of Novartis in patent litigation between the two private parties on this key patent.

4.      In cases like this one, where a generic manufacturer submits an ANDA with a "Paragraph IV" certification (meaning that the applicant intends to challenge either the validity or infringement of the patent), pediatric exclusivity attaches when the patent "court determines that the patent is valid and would be infringed."  21 U.S.C. § 355a(c)(1)(B)(ii).  Both boxes are checked

here:  The Federal Circuit has recently concluded in a precedential decision that the patent is valid, and MSN has stipulated to infringement.

5.    To align ENTRESTO's regulatory status with the Federal Circuit's decision, Novartis asked FDA to immediately convert MSN's approval to a tentative approval as soon as the Federal Circuit ruled.  A tentative approval would prevent MSN from launching its product until the six-month pediatric exclusivity runs out.  But FDA has refused to do so.  As a result, Novartis will imminently be denied the benefit of the pediatric exclusivity it earned through its substantial investment.

6.    FDA's decision was unlawful for at least two reasons.  First, FDA's decision irrationally frustrates implementation of the pediatric-exclusivity statute.  The agency's actions flatly contradict the statutory requirement, and in doing so, the agency has denied Novartis the benefit of the incentive Congress created to reward an action Novartis indisputably performed.  FDA's conduct further creates an absurd result:  FDA's interference effectively vitiates not only Congress's mandate, but also the Federal Circuit's judgment, which should control the outcome.  Finally, FDA's conduct was unlawful because it failed to treat like cases alike, deviating from its prior practice with no acknowledgment of that deviation, let alone a rational explanation rooted in the statute.

7.    For all these reasons, FDA's refusal to effectuate Novartis's pediatric exclusivity should be vacated and set aside.

8.    Time is of the essence in this case.  FDA's actions permit a purported generic version of ENTRESTO to flood the market at any moment after patent expiration on at **11:59 p.m. on January 15**, critically and irreparably harming Novartis and the market share and goodwill it has built up for its best-selling product, as well as vitiating the pediatric-exclusivity period that

Novartis properly earned through July 15. For that reason, Novartis plans to seek a temporary restraining order (TRO) restoring its pediatric exclusivity and converting the MSN approval to a tentative approval.

## PARTIES

9.      Plaintiff Novartis Pharmaceuticals Corporation is a corporation organized in Delaware with its principal place of business at 59 Route 10, East Hanover, New Jersey 07936.

10.     Defendant Xavier Becerra is the Secretary of HHS and is responsible for administering and enforcing the Food, Drug, and Cosmetic Act, 21 U.S.C. § 321, *et seq.* Defendant Becerra maintains an office at 200 Independence Avenue, S.W., Washington, DC 20201.

11.     Defendant Robert M. Califf, M.D., is the Commissioner of Food and Drugs and is responsible for supervising the activities of FDA, an administrative agency within HHS. Defendant Califf maintains an office at 10903 New Hampshire Avenue, Silver Spring, MD 20993.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction under the following statutes:

a.      28 U.S.C. § 1331, because this civil action arises under the laws of the United States;

b.      28 U.S.C. § 1346(a)(2), because Novartis asserts claims against the United States;

c.      28 U.S.C. § 1361, because this is an action to compel officers of the United States to perform their duties; and

d.      28 U.S.C. §§ 2201–02, because this is an actual, justiciable controversy as to which Novartis requires a declaration of its rights by this Court and injunctive relief to prohibit Defendants from violating laws and regulations.

13.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(A) because this is a civil action in which Defendants are officers of the United States acting in their official capacities and at least one defendant resides in this judicial district.

## FACTUAL BACKGROUND

### I.    Statutory and Regulatory Background

14.    The Federal Food, Drug, and Cosmetic Act (FDCA) provides the statutory framework for FDA's regulatory oversight of drug products.

15.    Before a "new" drug can be marketed, FDA must approve an application submitted by its sponsor.  21 U.S.C. §§ 355(a), 331(d).  To gain approval to market a brand-name drug, an innovator manufacturer can submit a full New Drug Application (NDA) under Section 505(b)(1) of the FDCA.  21 U.S.C. § 355(b)(1).  An NDA generally contains reports of scientific studies conducted by or for the applicant, demonstrating that the drug is safe and effective.  After a period of marketing exclusivity and expiration of any applicable patent rights, FDA may approve applications to market generic versions of the innovator drug, so long as they meet the criteria for approval.

### A.    The Generic-Approval Process

16.    Under the Hatch-Waxman Act,[1] generic drugs may be approved through a shorter process that generally does not require a new demonstration of safety and effectiveness through clinical studies.  Instead, a generic manufacturer files an Abbreviated New Drug Application (ANDA) under Section 505(j) of the FDCA.  21 U.S.C. § 355(j).  An ANDA certifies "that the generic has the 'same active ingredients as,' and is 'biologically equivalent' to, the already-approved brand-name drug." *FTC v. Actavis, Inc.*, 570 U.S. 136, 142 (2013) (quoting *Caraco Pharm.*

---

[1]  Formally known as the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355).

*Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405 (2012)). Those equivalence showings are important because an ANDA relies on FDA's finding of safety and efficacy for the previously approved brand name drug, known as the "reference listed drug." *See* 21 U.S.C. § 355(j)(2); 21 C.F.R. § 314.94(a)(3).

17. An ANDA applicant must certify that its marketing of the proposed generic would not infringe a valid patent covering the reference listed drug. 21 U.S.C. § 355(j)(2)(A)(vii)–(viii). To facilitate such certifications, FDA maintains the *Orange Book* (formally titled *Approved Drug Products with Therapeutic Equivalence Evaluations*), in which innovator manufacturers must list patents that cover certain aspects of the reference listed drug.

18. When patents covering the reference listed drug are recorded in the *Orange Book*, the type of certification or statement an ANDA applicant must file depends on the status of the relevant patents and whether the applicant intends to challenge the patent rights at issue. Of relevance here, an ANDA applicant may file a "Paragraph II certification," which indicates that any implicated patents have already expired. 21 U.S.C. § 355(j)(2)(A)(vii)(II). It may file a "Paragraph III certification," which provides the date(s) on which implicated patents will expire, thereby indicating that the applicant will not enter the market until after patent expiry. *See id.* § 355(j)(2)(A)(vii)(III). Or it may file a "Section viii statement," which indicates that that the applicant does not seek approval for the conditions of use claimed by the patent. *See id.* § 355(j)(2)(A)(viii).

19. If an ANDA applicant intends to challenge the patent rights at issue, it must file a Paragraph IV certification. A Paragraph IV certification claims that implicated patents are invalid and/or will not be infringed by the proposed generic. 21 U.S.C. § 355(j)(2)(A)(vii)(IV). It also states that the ANDA applicant will notify the patentholder and NDA holder of the reference listed

drug of the ANDA applicant's intention to challenge the patent rights at issue, as required by the FDCA. *See id.* § 355(j)(2)(B).

20.     Notice of a Paragraph IV certification triggers an innovator manufacturer's ability to bring patent litigation against an ANDA applicant. Once an innovator manufacturer receives such notice, it has 45 days to file a complaint if it wishes to preserve its patent rights during the ensuing litigation. 21 U.S.C. § 355(j)(5)(B)(iii). A complaint filed within 45 days triggers a 30-month stay: a period running from the date on which the innovator manufacturer received notice of the paragraph IV certification, during which FDA cannot grant an ANDA final approval, giving the innovator manufacturer marketing exclusivity. *Id.*

### B.    Pediatric Exclusivity

21.     The FDCA awards an innovator manufacturer additional marketing exclusivity in some circumstances, typically when deemed necessary to incentivize research. Relevant here, manufacturers may earn an additional six months of "pediatric exclusivity" when they complete specific clinical investigations requested by FDA to study the effect of the drug in children. *See generally* 21 U.S.C. § 355a.

22.     Pediatric exclusivity "provides an incentive for a drug patent holder to conduct pe-diatric studies of a drug which the FDA believes may have beneficial pediatric use." *Mylan Lab'ys, Inc. v. Thompson*, 389 F.3d 1272, 1276 (D.C. Cir. 2004) (*Mylan I*). Before Congress crafted the pediatric-exclusivity statute, the FDCA had "failed to provide sufficient incentives for drug com-panies to conduct research on the effects of new drugs on children." *Amgen Inc. v. Hargan*, 285 F. Supp. 3d 351, 358 (D.D.C. 2018) (citing S. Rep. No. 107–79, at *3–4 (2001)). But such studies are often "necessary to provide useful information on drug use in children." *See* FDA, *Qualifying for Pediatric Exclusivity Under Section 505A of the Federal Food, Drug, and Cosmetic Act: Fre-quently Asked Questions on Pediatric Exclusivity (505A)* (Mar. 1, 2022), *available at*

https://www.fda.gov/drugs/development-resources/qualifying-pediatric-exclusivity-under-sec-tion-505a-federal-food-drug-and-cosmetic-act-frequently.

23.     To earn pediatric exclusivity, an innovator manufacturer must satisfy a few basic statutory requirements.  First, FDA must request that an innovator manufacturer conduct pediatric studies.  21 U.S.C. § 355a(c)(1).  An innovator manufacturer must timely complete the requested studies and submit reports describing the results of the studies to FDA.  *Id.*  The studies must "fairly respond to the written request, have been conducted in accordance with commonly accepted scientific principles and protocols, and have been reported in accordance with the requirements of the Secretary for filing."  *Id.* §§ 355a(c)(1), (d)(4).  If the studies timely qualify, FDA must accept them, which entitles the innovator manufacturer to the exclusivity.  *See id.* §§ 355a(b)(1), (c)(2) (d)(4).

24.     Once granted, pediatric exclusivity effectively extends enumerated preexisting exclusivity periods by an additional six months.  *See generally* 21 U.S.C. § 355a(c)(1).  One example of a preexisting exclusivity period is a patent term covering the reference listed drug.  *Id.* § 355a(c)(1)(B).  When pediatric exclusivity attaches to a patent term, it commences on the day the patent expires.  *See id.*  During an innovator manufacturer's pediatric-exclusivity period, an ANDA referencing the protected drug "may not be approved."  *Id.*

25.     Attachment of pediatric exclusivity to a patent term unconditionally prevents an ANDA from being "approved" for six months in all but one scenario.  If an ANDA applicant has filed a Paragraph IV certification, exclusivity attaches only if "in the patent infringement litigation resulting from the certification the court determines that the patent is valid and would be in-fringed."  21 U.S.C. § 355a(c)(1)(B)(ii).  That condition does not apply if an ANDA applicant files a Paragraph II or Paragraph III certification.  *Id.* § 355a(c)(1)(B)(i).  If an ANDA includes a

Paragraph II or Paragraph III certification, FDA is automatically barred from finally approving an ANDA for an additional six months beyond the patent's term. *Id.* When an ANDA cannot be "approved," FDA may issue an interim tentative approval, signifying that the ANDA is approvable once the exclusivity period expires. *See* 21 C.F.R. § 314.105(d).

26.    Earning pediatric exclusivity requires a substantial investment from an innovator manufacturer. That is why the statute provides an exclusivity period; it is offered "in return for" for the valuable information the innovator manufacturer has created. *See Mylan I*, 389 F.3d at 1284. Thus, an innovator manufacturer earns a "statutory right" to pediatric exclusivity, and the loss of that exclusivity period would constitute a "significant harm." *See Apotex Inc. v. FDA*, 508 F. Supp. 2d 78, 88 (D.D.C. 2007).

**The Interplay Between Patent Rights and Pediatric Exclusivity**

27.    When a patent is subject to a Paragraph II certification, pediatric exclusivity is unconditional—"the period during which an [ANDA] may not be approved . . . shall be extended." 21 U.S.C. § 355a(c)(1)(B)(i) (emphasis added). When a patent is subject to a Paragraph IV certification, by contrast, pediatric exclusivity applies when a court determines "that the patent is valid and would be infringed." *Id.* § 355a(c)(1)(B)(ii). But in both scenarios, the statutory mandate to FDA is that an ANDA "may not be approved." *See id.* § 355a(c)(1)(B).

28.    Patent expiry is a critical moment for purposes of pediatric exclusivity. Not only does patent expiration trigger the six-month exclusivity period, 21 U.S.C. § 355a(c)(1)(B), but it also can change the type of certification to which a patent is subject. That is because a Paragraph IV certification, by definition, can apply only to an unexpired patent. The statute requires the certification to assert that a "patent is invalid or will not be infringed" by a generic's launch. *Id.*

§ 355(j)(2)(A)(vii)(IV). So by necessity, a Paragraph IV certification does not survive a patent's expiration.

29.    FDA and courts have therefore long recognized that, at the moment of patent expiry, a Paragraph IV certification converts to a Paragraph II certification. Ex. D (Amlodipine Letter) at 8 (noting that "the paragraph II provision of the pediatric exclusivity statute . . . would control" "upon patent expiry"); *Ranbaxy Lab'ys Ltd. v. FDA*, 307 F. Supp. 2d 15, 21 (D.D.C. 2004) ("[T]he Paragraph IV certifications became invalid" at the "magic moment" of patent expiry "and either converted as a matter of law to Paragraph II certifications or became inaccurate [and unapprovable]."), *aff'd* 96 F. App'x 1 (D.C. Cir. 2004); *accord Mylan I*, 332 F. Supp. 2d 106, 122–23 (D.D.C. 2004), *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004); *Mylan Lab'ys, Inc. v. Leavitt*, 484 F. Supp. 2d 109, 120 (D.D.C. 2007) (*Mylan II*).

## II.    Novartis's ENTRESTO

30.    ENTRESTO is a prescription heart-failure medication. FDA approved ENTRESTO in July 2015 to reduce the risk of cardiovascular death and hospitalization for adults with chronic heart failure. ENTRESTO is a "first-in-class" medicine that "made available a novel, oral treatment option," creating a "significant mortality benefit." Loretta Fala, *Entresto (Sacubitril/Valsartan): First-in-Class Angiotensin Receptor Neprilysin Inhibitor FDA Approved for Patients with Heart Failure*, 8 Am. Health Drug Benefits 330, 334 (Sept. 2015), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC4636283/.

### A.    ENTRESTO's Patent Rights and Pediatric Exclusivity

31.    Novartis timely listed in the *Orange Book* several patents covering ENTRESTO. The patent most relevant to this case is U.S. Patent No. 8,101,659 (the '659 patent), which covers combinations of sacubitril and valsartan, ENTRESTO's active ingredients. Novartis listed the '659 patent in August 2015, and it will expire after 11:59 p.m. on January 15, 2025.

32.     During the approval process for ENTRESTO, Novartis successfully completed pediatric studies pursuant to an FDA request.  FDA accepted Novartis's reports of those studies and determined that Novartis is entitled to pediatric exclusivity for ENTRESTO.  *See* FDA, *List of Determinations Including Written Requests, Pediatric Exclusivity Determinations Made Under Section 505A of the Federal Food, Drug, and Cosmetic Act (the Act), as amended by the FDA Amendments Act of 2007 (FDAAA)* (last updated Dec. 23, 2024) (FDA Pediatric Exclusivity Determinations),  *available at*  https://www.fda.gov/drugs/development-resources/list-determinations-including-written-request.

33.     Novartis's pediatric studies also led to an approved pediatric indication for ENTRESTO.  Diana Ernst, *Entresto Approved to Treat Pediatric Heart Failure*, Med. Pros. Reference (Oct. 2, 2019), https://www.empr.com/home/news/entresto-approved-to-treat-pediatric-heart-failure/; *see also* FDA, Center for Drug Evaluation & Rsch., *Approval Package for Application Number 207620Orig1s018* § 1.2 (Feb. 16, 2021) (FDA Approval Package),  https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/207620Orig1s018.pdf.  That outcome, however, was not necessary for Novartis to earn pediatric exclusivity.

**B.     MSN's ANDA and Ensuing Patent Litigation**

34.     Generic manufacturer MSN Laboratories Private LTD filed an ANDA (No. 213748) in 2019 identifying ENTRESTO as the reference listed drug.  The ANDA contained a Paragraph IV certification as to the '659 patent.

35.     Novartis sued MSN Laboratories Private LTD, MSN Pharmaceuticals, Inc., and MSN Life Sciences Private LTD. (together "MSN") in the United States District Court for the District of Delaware for patent infringement within 45 days of receiving notice of MSN's Paragraph IV certification.  *See Novartis Pharms. Corp. v. Dr. Reddy's Lab'ys*, No. 1:19-CV-2053 (D.

Del. filed Oct. 29, 2019), ECF No. 1 at 8–12.  Thus, Novartis triggered a 30-month stay of FDA's ability to approve MSN's ANDA.  *See* 21 U.S.C. § 355(j)(5)(B)(iii).

36.     Novartis's case against MSN was consolidated with cases against other ANDA filers into *In re Entresto (Sacubitril/Valsartan) Patent Litigation*, No. 1:20-MD-2930 (D. Del.).  MSN ultimately stipulated that its purported generic product would infringe the '659 patent.  *Id.*, ECF No. 540.  The sole contested issue as to that patent was therefore its validity.

37.     The district court initially held the patent invalid.  *In re Entresto (Sacubitril/Valsartan) Patent Litig.*, No. 1:20-MD-2930 (D. Del. July 21, 2023), ECF No. 1120.  Novartis appealed that judgment to the U.S. Court of Appeals for the Federal Circuit.  *Novartis Pharms. Corp. v. Torrent Pharma Inc.*, No. 23-2218 (Fed. Cir. filed July 31, 2023).

38.     While Novartis's appeal was pending, FDA granted MSN's ANDA final approval.  Novartis therefore asked the Federal Circuit for an emergency injunction pending appeal to prevent MSN from attempting to market its product before Novartis's patent rights could be determined.  The Federal Circuit administratively enjoined MSN from marketing its product while the court considered the motion for an injunction pending appeal.  *Novartis Pharms. Corp. v. Torrent Pharma Inc.*, No. 23-2218 (Fed. Cir. Aug. 14, 2024), ECF No. 65.  The court later ordered that the injunction would "remain in effect pending further notice of the court."  *Id.*, ECF No. 73 at 3.  The Federal Circuit also later stayed the district court's judgment of invalidity as to another ANDA applicant.  *In re Entresto (Sacubitril/Valsartan)*, No. 23-2317 (Fed. Cir. Jan. 8, 2025), ECF No. 17.

## C.      FDA's Refusal to Protect Pediatric Exclusivity

39.     Undeterred, MSN announced its intention to launch its product at the earliest opportunity—regardless of whether the Federal Circuit had the chance to rule on the merits of the patent appeal, and regardless of whether FDA had the chance to implement pediatric exclusivity.

40.    Novartis asked FDA to take steps to prevent that from happening.  Novartis first sent the agency a letter on December 30, 2024, explaining the situation and requesting that FDA confirm that pediatric exclusivity applies to MSN's ANDA.  Novartis noted that FDA could do one of two things to accomplish that.  Ex. A (December 30 Letter) at 5.  FDA could convert its prior final approval to a tentative approval via a process established by regulation.  *Id.* (citing 21 C.F.R. § 314.107(g)).  Or FDA could use its inherent authority, supported by precedent, to stay its prior approval of MSN's ANDA.  *Id.* (citing 21 C.F.R. § 10.35(a)).  Either action, Novartis explained, would preserve the status quo pending a final outcome of the patent litigation and ensure that Novartis would receive its pediatric exclusivity under the circumstances provided by statute. *See id.* at 5–6.

41.    Novartis explained that FDA's failure to act would lead to an irrational outcome that would frustrate the purpose of pediatric exclusivity.  The '659 patent was still entitled to a presumption of validity, *see* 35 U.S.C. § 282(a), particularly given the Federal Circuit's injunction preventing MSN from marketing its product.  *See* Ex. A (December 30 Letter) at 4.  And the question of a patent's validity, as the Federal Circuit has recognized, matters even after its expiration when pediatric exclusivity may turn on the question.  *In re Omeprazole Patent Litig.*, 536 F.3d 1361, 1367–68 (Fed. Cir. 2008).

42.    To Novartis's knowledge, FDA took no action in response to Novartis's December 30, 2024 letter.

**D.    Novartis's Victory Before the Federal Circuit**

43.    The Federal Circuit ruled resoundingly in favor of Novartis on January 10, 2025. *Novartis Pharms. Corp. v. Torrent Pharma Inc.*, No. 23-2218 (Fed. Cir. Jan. 10, 2025), ECF 106. In a precedential decision, it explained that the district court had "erroneously conflated . . . distinct

issues" in making its invalidity finding. *See id.* at 12–14. The Federal Circuit rejected each of MSN's remaining arguments and found the '659 patent valid. *Id.* at 15–17.

44.    At the same time, the Federal Circuit dissolved its injunction preventing MSN from commercial marketing. *Novartis Pharms. Corp. v. Torrent Pharma Inc.*, No. 23-2218 (Fed. Cir. Jan. 10, 2025), ECF 109. The court suggested that its basis for providing that preliminary relief had been mooted by its decision for Novartis on the merits. *See id.* at 3. But because of FDA's prior approval of MSN's ANDA, the Federal Circuit's dissolution of the injunction left no judicial restraint on MSN's ability to launch.

45.    Later that day, the district court overseeing the patent case held a TRO hearing. After the hearing, MSN notified the patent judge that it would not launch its product until after the patent expires on January 15. Novartis later filed a sealed motion asking that district court for a Rule 62(d) injunction barring MSN from launching its product until further order of that court. But briefing on that motion is ongoing as of the filing of this complaint, and a hearing has been set for the morning of Wednesday, January 15, 2025. Under these circumstances, FDA had only a few more days to protect Novartis's pediatric exclusivity.

### E.    FDA's Continued Refusal to Act

46.    Novartis notified FDA by email of the Federal Circuit's decisions late in the evening on January 10–11. Ex. B (January 10 Letter). Novartis asked FDA again to confirm that pediatric exclusivity applies to the MSN ANDA by immediately converting its approval of MSN's ANDA into tentative approval or staying that approval. Only those actions, Novartis explained, would faithfully apply the pediatric-exclusivity statute and give Novartis the benefit Congress had provided in exchange for its investment. Novartis then sent FDA a follow-up email on January 12 asking the agency to confirm by 3:00 p.m. on January 13 that it would preserve Novartis's pediatric exclusivity. Ex. C (January 12 Email).

47.    FDA once more failed to act.  In an email to Novartis's counsel sent shortly before 3:00 p.m. on January 13, 2025, FDA simply noted that the agency was "not aware of a court order requiring [it] to convert MSN's approval to a tentative approval or otherwise directing the agency regarding MSN's ANDA."  Ex. F (FDA January 13 Email) at 1.  FDA did not explain, however, why it believed that observation was relevant.

**Novartis's Prior APA Case Against FDA**

48.    Apart from the patent dispute, FDA's approval of MSN's ANDA was also unlawful because it failed to meet the substantive requirements for generic approval.  So Novartis previously sued FDA in this district under the APA, asking the court to vacate and set aside FDA's approval.  *Novartis Pharms. Corp. v. Becerra*, No. 24-CV-2234 (DLF) (D.D.C. filed July 30, 2024).  The court ultimately granted summary judgment for FDA.  *Id.* (D.D.C. Oct. 15, 2024), ECF No. 68.  Novartis appealed that decision, and that appeal remains pending.  *Novartis Pharms. Corp. v. Becerra*, No. 24-5235 (D.C. Cir. filed Oct. 15, 2024).

49.    Novartis believes it is likely to prevail in that appeal.  But the outcome of that case is not directly relevant to this case because Novartis here challenges a distinct FDA action that is unlawful for independent reasons.

## FDA'S CONDUCT IS UNLAWFUL

50.    Agency action violates the APA if it contravenes the text of an agency's governing statute.  *See Natural Res. Def. Council v. EPA*, 643 F.3d 311, 323 (D.C. Cir. 2011); *Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009); *Bennett v. Donovan*, 4 F. Supp. 3d 5, 13 (D.D.C. 2013); *Lone Mountain Processing, Inc. v. Secretary of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013).  The same is true for actions that violate the agency's own regulations.  *National Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014).  And courts

"may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

51.     The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

52.     Agency action is arbitrary and capricious if the agency fails to adequately explain a deviation from prior policy, *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003), ignores relevant evidence, *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010), or treats similarly situated entities differently, *Dillmon v. National Transp. Safety Bd.*, 588 F.3d 1085, 1089–90 (D.C. Cir. 2009).

53.     Agency action is also arbitrary and capricious if the agency "fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

54.     FDA violated all of these maxims here.

**Novartis's Federal Circuit Victory Obligated FDA to Act.**

55.     Once Novartis won its appeal in the Federal Circuit, the pediatric-exclusivity statute and FDA regulations both required the agency to immediately convert its approval of MSN's ANDA into a tentative approval.  That conclusion follows from the plain text of both authorities.

56.     Novartis has now satisfied all three statutory conditions for triggering pediatric exclusivity before patent expiry:  (1) ENTRESTO is "the subject of a listed patent for which a [Paragraph IV] certification has been submitted"; (2) that Paragraph IV certification resulted in "patent

infringement litigation"; and in that litigation, (3) "the court determine[d] that the patent is valid and would be infringed." 21 U.S.C. § 355a(c)(1)(B)(ii).

57.    The statute applies pediatric exclusivity to ANDAs with a Paragraph IV certification when "the court determines that the patent is valid and would be infringed." 21 U.S.C. §355a(c)(1)(B)(ii). The Federal Circuit judgment concluded that the patent is valid, and MSN has stipulated to infringement, *In re Entresto (Sacubitril/Valsartan) Patent Litig.*, No. 1:20-MD-2930 (D. Del. July 21, 2023), ECF No. 1120 at 2. In refusing to protect Novartis's pediatric exclusivity, FDA has acted in a manner inconsistent with the statute. It is true that the district court initially found the patent invalid. But the Federal Circuit subsequently stayed that decision, and then reversed it entirely. The district court's decision is therefore not in place as expiration of the patent approaches, regardless of whatever ministerial steps may yet happen to implement the Federal Circuit's decision.

58.    The fact that MSN had already received an ANDA approval prior to the Federal Circuit's decision also does not absolve FDA from applying pediatric exclusivity. FDA's regulations recognize that when a "court enters an order requiring, in the case of an already approved . . . ANDA, that the date of approval be delayed, FDA will convert the approval to a tentative approval if appropriate." 21 C.F.R. § 314.107(g). FDA regulations also acknowledge that tentative approval is the appropriate status for an ANDA that "cannot be approved . . . because there is a period of pediatric exclusivity for the listed drug." *Id.* § 314.3 (defining "[t]entative approval").

59.    Here, the practical effect of the Federal Circuit's decision is to require a delay in the effective approval date of MSN's ANDA. When the case returns to the district court, the outcome will be preordained: MSN's ANDA constituted an "act of infringement" of a valid patent. *See* 35 U.S.C. § 271(e)(2)(A). Thus, the district court "shall order the effective date of any

approval of" MSN's product to be a date that is after the expiration of Novartis's pediatric exclusivity on July 15, 2025.  *Id.* § 271(e)(4)(A).  Because that outcome follows inexorably from the Federal Circuit's decision, its decision constitutes "an order requiring . . . that the date of approval be delayed."  *See* 21 C.F.R. § 314.107(g).

60.     In this situation, where the Federal Circuit has issued a judgment of patent validity and MSN has stipulated to infringement, it would be absurd for FDA to allow MSN to enter the market during the pediatric-exclusivity period.  The "best reading" of the statute under *Loper Bright* is one that preserves the pediatric-exclusivity period consistent with the intent of the statute.

61.     In addition, when pediatric exclusivity is triggered, "the period during which an [ANDA] *may not be approved* . . . shall be extended by a period of six months after the date the patent expires."  21 U.S.C. § 355a(c)(1)(B)(ii) (emphasis added).  That statutory language, cast in the present tense, reflects a focus on the present status of an ANDA.  That language precludes the existence of an approved ANDA during an innovator manufacturer's exclusivity period—because that status would be flatly inconsistent with the exclusivity Congress provided.  *See, e.g., Community Progress, Inc. v. Martinez*, 420 F. Supp. 204, 206 (D. Conn. 1976) ("A legislative command cast in the present tense creates a continuing obligation.").

62.     Despite its clear statutory command, FDA has refused to take steps to protect Novartis's pediatric-exclusivity period.  MSN's ANDA remains approved as Novartis's pediatric-exclusivity period commences.  By refusing to correct that incongruity, FDA violated the statute, and its decision should be vacated and set aside.  *See Orion Rsrvs. Ltd. P'ship*, 553 F.3d at 703.

**FDA's Refusal to Act Was Arbitrary and Capricious.**

63.     FDA's refusal to convert its final approval of MSN's ANDA into tentative approval or to stay that approval also is arbitrary and capricious, for at least two reasons.  *First*, FDA's

decision irrationally frustrated the statutory purpose by denying Novartis pediatric exclusivity it has undisputedly earned.  *Second*, FDA treated like cases differently without adequate explanation.

64.     The purpose of the pediatric-exclusivity statute is to incentivize innovator manufacturers to complete studies that may reveal beneficial uses for medicines in children.  *Mylan I*, 389 F.3d at 1276.  Absent that exclusivity, as Congress expressly recognized when considering enacting the pediatric-exclusivity statute, many drugs that have beneficial uses in children would never receive a pediatric indication.  S. Rep. No. 105–43, at *51 (1997) (noting the "ethical and moral issues," "product liability and medical malpractice issues," and administrative challenges pediatric studies can create, all for "little additional revenue").  That is why innovator manufacturers are supposed to receive six months of exclusivity "in return for" for their efforts.  *See Mylan I*, 389 F.3d at 1284.  That exclusivity constitutes a "statutory right," *see Apotex Inc.*, 508 F. Supp. 2d at 88, and innovator manufacturers cannot expend the resources needed to earn pediatric exclusivity unless they can be sure they will benefit from that right.

65.     There is no dispute that Novartis earned pediatric exclusivity for ENTRESTO.  *See* FDA Pediatric Exclusivity Determinations, *supra*.  Novartis's pediatric studies also led to an approved pediatric indication for ENTRESTO.  *See* FDA Approval Package, *supra* at § 1.2.  FDA's refusal to convert its final approval of MSN's ANDA into tentative approval or to stay that approval prevented Novartis from benefitting from the exclusivity it earned.

66.     FDA's refusal to act also fosters absurd results.  It is now settled that MSN's product infringes Novartis's valid patent, yet MSN may launch its generic and flood the market with that product.  In the process, MSN will cause Novartis grave harm and render its statutory right to pediatric exclusivity meaningless.  And FDA threatens to destroy the value of any post-mandate

enforcement of pediatric exclusivity that Novartis might later obtain because generic entry is a bell that cannot be un-rung, as explained further below. *Infra* Section III.

67.     FDA's decision also places undue weight on the timing of the Federal Circuit's decision. Had the Federal Circuit rendered a judgment that the '659 patent was valid a few months earlier, before FDA finally approved MSN's ANDA, Novartis would have benefitted from its pediatric exclusivity. But because of FDA's failure to act, the same judgment rendered by the same court a few months later is toothless. Novartis's ability to benefit from its statutory right should have been determined by *what* the Federal Circuit said—not when it said it.

68.     Similarly, FDA's actions give greater effect to a district court judgment now known to be erroneous than to an appellate court's decision correcting that mistake. Had the district court rendered the correct judgment from the start, FDA could not have approved MSN's ANDA before January 15, 2025, and Novartis would have benefitted from its pediatric exclusivity. *See* 35 U.S.C. § 271(e)(4)(A); 21 U.S.C. § 355a(c)(1)(B)(ii). The appellate process is supposed to correct errors, but FDA rendered the Federal Circuit's correction meaningless. It is hard to imagine a more absurd result under these circumstances than an agency's claiming the ability to brush off the outcome of a federal appellate court's judgment simply because it postdated the agency's initial decision.

69.     Agency action that produces absurd results is arbitrary and capricious. *Duggan v. Bowen*, 691 F. Supp. 1487, 1513 (D.D.C. 1988). FDA's refusal to act violated that maxim by "denying [Novartis] the reward it earned" in a way that "elevate[d] form over substance." *See Watson Lab'ys, Inc. v. Sebelius*, No. 12-CV-1344 (ABJ), 2012 WL 6968224, at *19–20 (D.D.C. Oct. 22, 2012), *vacated as moot*, No. 12-5332, 2013 WL 11250319 (D.C. Cir. June 10, 2013).

70.     In sum, FDA failed to "interpret the statute to avoid absurd results and further congressional intent." *Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1011 (D.C. Cir. 1999). Thus,

the agency's refusal to convert its final approval of MSN's ANDA into tentative approval or to stay that approval should be vacated and set aside.

71.     FDA's decision is also inexplicably inconsistent with its own prior practice.  Historically, FDA has taken the wait-and-see approach it silently spurned here.

72.     In *Mylan I*, for instance, the agency converted an ANDA approval from final to tentative in response to a district-court decision postponing the approval's effective date.  389 F.3d at 1281.  As a result of that conversion, the ANDA applicant's Paragraph IV certification converted to a Paragraph II certification upon patent expiry, triggering the innovator manufacturer's pediatric exclusivity.  *Id.* at 1282–83.  This solution, the D.C. Circuit explained, "effects the policies of both the generic ANDA provision . . . and the pediatric exclusivity provision, by granting [an innovator manufacturer] a six-month exclusivity period in return for the pediatric studies it performed."  *Id.* at 1284; *see also Apotex*, 508 F. Supp. 2d at 84–85 (upholding FDA's conversion of prior final approval to tentative where another district court had imposed a period of pediatric exclusivity under 35 U.S.C. § 271(e)(4)(A)).

73.     FDA's refusal to act also constitutes an unexplained change in position.  FDA's only explanation for its conduct was to note that it was "not aware of a court order" that explicitly required the agency to act.  *See* Ex. F (FDA Email January 13) at 1.  Thus, the agency did not "display awareness" that it has historically acted to protect an innovator manufacturer's statutory right to exclusivity.  *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (quotation omitted).  FDA's "failure to even acknowledge its past practice[,] . . . let alone to explain its reversal of course" is prototypically "arbitrary and capricious."  *American Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017).

74. For those reasons, too, FDA's refusal to convert its final approval of MSN's ANDA into tentative approval or to stay that approval should be vacated and set aside.

## III. FDA's Conduct Will Cause Novartis and Patients Concrete, Imminent, and Irreparable Harm.

75. Novartis will be irreparably harmed unless FDA is immediately ordered to convert its final approval of MSN's ANDA into tentative approval.

76. Absent this Court's intervention, FDA's refusal to convert its final approval of MSN's ANDA into tentative approval will deny Novartis its "statutory right" to pediatric exclusivity, causing Novartis "significant harm." *See Apotex Inc.*, 508 F. Supp. 2d at 88. The denial of a statutory right constitutes irreparable harm. *See Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (collecting cases).

77. FDA's refusal to convert its final approval of MSN's ANDA into tentative approval opens the door for MSN to flood the market with its purported generic version of ENTRESTO at any moment. Generic drugs quickly replace branded products soon after their launch. *E.g.*, Henry Grabowski et al., *Continuing Trends in U.S. Brand-Name and Generic Price Competition*, 24 J. Med. Econ. 908–917 (2021); Richard G. Frank et al., *The Evolution of Supply and Demand in Markets for Generic Drugs*, 99 Milbank Q. 828, 835 (2021).

78. As a result of state automatic-substitution laws and other market dynamics, the purported generic product's market entry would cause ENTRESTO to suffer a dramatic loss of sales in the weeks and months following generic entry.

79. The impact on Novartis would be commercially devastating. ENTRESTO is Novartis's best-selling drug. Through the end of 2023, ENTRESTO has generated more than $10.5 billion in cumulative net sales in the United States since its launch. In 2021, ENTRESTO generated $1.7 billion in sales in the United States. In 2022, that figure grew to approximately $2.4

billion.  And in 2023, ENTRESTO produced more than $3 billion in U.S. sales.  Revenues from ENTRESTO account for more than 17% of Novartis's total U.S. revenues.  That revenue helps fund Novartis's operations, and permits the company to invest in promising new drugs—particularly those that address unmet needs.

80.     Because revenues from ENTRESTO form a critical part of Novartis's ability to fund research and development, unlawful entry of purported generic products would undermine Novartis's ability to invest generously in research and development.  The harms resulting from this lost investment could not be remedied after the fact:  Progress toward developing critical new therapies will have stalled, and Novartis will have been subjected to significant risk of falling behind its competitors.  And Novartis will have suffered permanent reputational injury and loss of goodwill, hampering its ability to effectively promote ENTRESTO in the future.

81.     Even if FDA later withdraws the purported generic product's approval, Novartis would be unable to regain its earlier position because the prescribing and usage patterns will have irreversibly shifted in response to MSN's product.

82.     Novartis would also be unable to recoup its current share of ENTRESTO sales because cash-paying patients are unlikely to be willing to pay a higher price for ENTRESTO after they have come to expect a lower price for a purported generic alternative.

83.     Unlawful entry of these purported generic products also will fundamentally affect Novartis's relationships with distributors and payers, undermine goodwill, and jeopardize key customer relationships.

84.     There is no mechanism by which Novartis can be made whole for the injury that would result from the entry into the marketplace of MSN's unlawful purported generic product.

And because the foregoing losses never can be recovered, Novartis will be irreparably harmed unless FDA's conduct is enjoined promptly.

85.　Because FDA's refusal to convert its final approval of MSN's ANDA into tentative approval clears the path for generic launch at any moment, these harms are imminent.

86.　Conversely, neither FDA nor MSN will suffer any significant hardship if FDA is ordered to convert its final approval of MSN's ANDA into tentative approval.  The status quo will be preserved, and FDA and MSN will simply be required to comply with the statute and regulations governing generic-drug approvals and pediatric exclusivity.

87.　The intent of Congress will be served by an order directing FDA to convert its final approval of MSN's ANDA into tentative approval.  In addition, such an order will serve the public interest by protecting patient safety, and requiring FDA to comply with its obligations.

### COUNT I
### (Administrative Procedure Act, 5 U.S.C. §§ 700, *et seq.*)

88.　Novartis realleges, reasserts, and incorporates by reference herein each of the foregoing allegations as though set forth fully herein.

89.　FDA's failure to implement Novartis's pediatric exclusivity was unlawful and in violation of the FDCA and the agency's own regulations, policies, and procedures.

90.　FDA's failure to implement Novartis's pediatric exclusivity constitutes agency action in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of 5 U.S.C. § 706(2)(C).

91.　FDA's failure to implement Novartis's pediatric exclusivity was not based on a reasoned decision or rational basis, and therefore was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

92.    FDA's failure to implement Novartis's pediatric exclusivity constitutes final agency action for which Novartis has no other adequate remedy within the meaning of 5 U.S.C. § 704.

93.    Both Novartis and the patient population will be irreparably harmed unless FDA is ordered to convert its final approval of MSN's ANDA into tentative approval and the MSN product is enjoined from launching pending resolution of this lawsuit.

94.    There is no mechanism by which Novartis can be made whole for the injury that would result from the entry into the marketplace of an unlawful MSN product.  Novartis lacks an adequate remedy at law because of the unique nature of the harm.

95.    The intent of Congress will be served by an order directing FDA to convert its final approval of MSN's ANDA into tentative approval.  In addition, the public interest will be served by such an order.

## PRAYER FOR RELIEF

For the foregoing reasons, Novartis prays for the following relief:

A.    Temporary, preliminary, and permanent injunctive relief compelling FDA to convert its final approval of MSN's ANDA to tentative approval, stay the approval, or take any other steps necessary to recognize and enforce Novartis's pediatric exclusivity for ENTRESTO;

B.    An order awarding Novartis its costs, expenses, and attorneys' fees incurred in these proceedings pursuant to 28 U.S.C. § 2412; and

C.    Such other and further relief as the Court deems proper.

Dated: January 13, 2025

Respectfully submitted,

*/s/ Susan M. Cook*
Susan M. Cook (D.C. Bar No. 462978)
Marlan Golden (D.C. Bar No. 1673073)
Jacob T. Young (D.C. Bar No. 90014334)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
susan.cook@hoganlovells.com

*Attorneys for Plaintiff Novartis Pharmaceuticals
Corporation*

## <u>VERIFICATION</u>

I, the undersigned, having read the allegations of the foregoing Verified Complaint, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the factual allegations asserted in the Verified Complaint are true and correct.

Executed this 13th day of January, 2025.

Travis Roop